ORDER AND JUDGMENT*
JEROME A. HOLMES, Circuit Judge.
Defendant-Appellant Christopher Adam Dayton brings a sufficiency-of-the-evidence challenge to his convictions for distributing and possessing child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B). Mr. Dayton does not dispute that he distributed and possessed child pornography. Rather, Mr. Dayton argues that, because the government did not offer evidence that the images and videos charged in the indictment had traveled in interstate or foreign commerce, the government failed to offer sufficient proof of the requisite jurisdictional nexus of a movement across state lines under United States v. Schaefer, 501 F.3d 1197 (10th Cir.2007). Generally, in Schaefer, we held that “the government was required to prove that any Internet transmissions containing child pornography that moved to or from [the defendant’s] computer crossed state lines” and noted that “the government offered no proof that the particular images on the CDs in question moved across state lines.” Id. at 1202, 1206 (emphasis added).
Thus, Mr. Dayton contends that evidence showing original photographs or videos that contain the charged images were produced outside of the state of Oklahoma is not sufficient under Schaefer, instead, the government must prove that the particular images stored on and downloaded from his computer moved in interstate or foreign commerce. Mr. Dayton urges us to reverse and enter a judgment of acquittal on both counts. In the alternative, he argues that the district court improperly instructed the jury on the element of distribution.
Exercising jurisdiction under 28 U.S.C. § 1291, we REVERSE Mr. Dayton’s convictions and REMAND the case to the district court with instructions to VACATE its judgment and enter a judgment of acquittal.
I. Background
On March 30, 2007, in Tulsa, Oklahoma, FBI Special Agent Cecchini, who is assigned to the FBI’s Innocent Images Na *584 tional Initiative, accessed the peer-to-peer (“P2P”) program LimeWire through the Internet as part of an undercover investigation into child pornography. LimeWire is a free-access file-sharing program that allows users to make files available to all other LimeWire users by placing them in a shared file folder. Any LimeWire user may access that folder to download files.[1] LimeWire provides users with a search function, involving the use of keywords, that allows them to search for particular types of files. When a LimeWire user locates a file he wishes to download, Lime-Wire automatically will find all of the users who possess that file in their shared folders and will download parts of the file from all of them, thereby increasing the download speed. The FBI has a specialized version of LimeWire that circumvents the usual downloading process and allows agents to download the file from only one person “so that [it] can definitively say that this one person, this one [Internet Protocol (‘IP’) ] address offered that file.” R, Vol. II, Pt. 1, Tr. at 110.[2]
Using LimeWire, Agent Cecchini ran a keyword search for “8 yo girl,” a term associated with child pornography that refers to an eight-year-old child. The search revealed a file matching that description belonging to an IP address in Tulsa, Oklahoma. That IP address had been assigned by Internet service provider Cox Communications, and the shared folder contained 323 shared files. From the shared folder associated with the Tulsa IP address, Agent Cecchini downloaded three complete and one partial video files that appeared to contain child pornography. With that information, agents issued a subpoena to Cox Communications, which provided them with subscriber information for that IP address. Agents thereafter located the physical address of the residence associated with the IP address and obtained a search warrant.
On the morning of April 18, 2007, eleven FBI agents and other personnel executed the search warrant at Mr. Dayton’s residence, which he shared with other family members. Mr. Dayton acknowledged that the Cox account and IP address were his and admitted that “he’d been downloading child pornography and using LimeWire for about three months.” Id. at 135. Mr. Dayton also wrote a statement, in which he confessed that “about 3-4 months ago I started to use [L]ime[W]ire and axedentle [sic] saw child porn and started to download it. I hated myself for it and deleted it[,] but I downloaded] it agen [sic] and I’m sory [sic]. And [I] burned it to 3 cds.” R., Vol. I, Pt. 1, at 90 (Attach, to Mot. Suppress, filed Mar. 21, 2008). Agents seized a computer and two hard drives from the Dayton home, along with 169 CDs and DVDs. A forensic examiner for the FBI later discovered pictures and video files constituting child pornography on the hard drives and CDs.
On May 9, 2007, Mr. Dayton was charged in a two-count indictment with knowingly distributing or attempting to distribute visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2), and knowingly possessing or attempting to possess visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B). On March 21, 2008, Mr. Dayton moved to dismiss the indict *585 ment for failure to establish the interstate commerce nexus of either charge.
Mr. Dayton argued that Cox Communications was solely an intrastate Internet provider. Although he acknowledged that it was possible that the government could have additional evidence of the interstate nexus in its possession—which it had not shared with him but which it planned to offer at trial—he contended that if the government intended to rely only upon the evidence concerning Cox Communications, that evidence was insufficient to prove an interstate nexus under Schaefer. Mr. Dayton also moved to suppress his statements to police, arguing that they were obtained in violation of the Fifth and Sixth Amendments. The district court took both motions under advisement until the close of the government’s case, and the case proceeded to a three-day jury trial.
At trial, Agent Cecchini testified about the investigation that led to Mr. Dayton’s indictment. The jury also was shown the four videos that Agent Cecchini downloaded from Mr. Dayton’s computer through LimeWire. While those videos played, Agent Cecchini described the sexual acts depicted. He testified that the videos appeared to depict adults involved in various sexual acts with minor children. Another witness, Dr. Deborah Lowen, a Tulsa area pediatrician specializing in the area of child-abuse pediatrics, testified that the children depicted ranged in age from approximately five to fourteen years of age.
The following evidence, which is relevant to the question of whether the images moved across state lines, was adduced at trial. Agent Cecchini testified that he had seen one of the videos “many times” and that the minor female (referred to as “Vicky”) in the -video was from Richland, Washington. R., Vol. II, Pt. 1, Tr. at 123. He also testified that he had seen all of the videos before, and that he previously had received these images from foreign countries. However, Agent Cecchini testified that he did not know if Mr. Dayton had distributed any of the videos to anyone else and did not know where Mr. Dayton had gotten the images. Agent Cecchini also stated that agents knew that the Cox Communications IP address was located in Tulsa, Oklahoma, but he did not know where Cox Communications’s server was located. Agent Cecchini acknowledged that in transferring files from Mr. Dayton’s computer to the FBI’s office in Tulsa, the images did not at that time move in interstate commerce.
Another witness for the government, FBI Special Agent Trifiletti, a specialist in victim identification, testified that he had identified the minors in three of the images recovered from Mr. Dayton as girls from Paraguay who were ten and twelve years old. Agent Trifiletti testified that the images were manufactured in Paraguay and that the FBI knew the identity of the man who had taken the pictures and disseminated them for profit. He stated that, in order for the Paraguayan images to be found on a computer in Oklahoma, they necessarily had to travel in interstate and foreign commerce. He explained:
I can see no way for it [to get from Paraguay to the United States] other than to have been sent by Internet, mail, airplane. Maybe an analogy is appropriate; if we had a photograph taken of this courtroom today and it wound up in New York a number of years later, how did it leave Oklahoma? It’s true of these photos as well. At some point, these photographs left Paraguay to be in the United States.
R., Vol. II, Pt. 2, Tr. at 235. He also testified that “I don’t know how they got to the United States, other than that they left Paraguay in digital form.” Id. at 239.
*586 After the close of the government’s case, Mr. Dayton moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, based on his contention that the evidence was insufficient to establish the interstate nexus. The court denied the motion, finding that “there are specific exhibits which have traveled in interstate commerce, or foreign commerce in this particular case.” Id. at 253. But the court took under advisement the question of exactly which images would be submitted to the jury.
The parties revisited this issue at the initial jury instruction conference, where the judge ruled on which images would be submitted to the jury. The district court granted Mr. Dayton’s Rule 29 motion as to “a great number of the images” based on the court’s conclusion that, under its reading of Schaefer, the government had failed to offer sufficient evidence to prove the interstate commerce nexus. Id. at 311. However, the court denied the motion as to seven images, concluding that the nexus had been proven as to them. Those seven images included the three pictures from Paraguay and the four videos downloaded by Agent Cecchini.
Because Agent Trifiletti had testified as to the identity of the three Paraguayan children, and knew that they had never left Paraguay, the district court judge concluded that, “I don’t think there’s any question” that those three images traveled in interstate commerce. Id. at 313. The court further held that the evidence was sufficient to prove interstate travel as to the four videos. It based that conclusion in part on Agent Cecchini’s testimony “that he had downloaded these files ... from every state but two. And so he had definitely seen th[o]se files on the Internet and from other investigations in other areas.” Id. at 311, 313-14.
For three out of the four videos, the court not only considered that testimony but also relied on what it considered to be proof that the videos were made outside of the United States. As to the first video, the district court considered the words “cambodian [sic]” and “sex tourist” in the title to be proof that the video was made outside the country; the court also found that the video “ha[d] all the makings and markings of something that was produced in Southeast Asia” because it featured a child who was “obviously Southeast Asian,” “an older woman ... who’s obviously Southeast Asian,” and “an overweight white person who could be a tourist.” Id. at 313. As to the second video, which was referred to during the trial as the “babysitter abuse tape,” the court relied on the fact that the child was speaking a foreign language that sounded like German or Russian. Id. at 314. The court found that the third video, the “Vicky” video, had been identified by Agent Cecchini as involving a girl from Richland, Washington, and that the same video had been involved in a case in Virginia. Id.
The district court held that the remaining images should not be submitted to the jury because “Cox is located in Oklahoma City, so the government cannot prove interstate travel that way.” Id. at 315. Moreover, “[t]he government hasn’t presented evidence that any of the files allegedly distributed by defendant moved in interstate or foreign commerce at the time defendant distributed them since [Agent] Cecchini downloaded them from a location in Oklahoma. In fact, they went from Tulsa, Oklahoma to Tulsa, Oklahoma.” Id. at 316. Moreover, although the court believed that the government could prove the interstate nexus by showing that the image moved in interstate commerce at some point in time, the court interpreted Schaefer as requiring a connection between an image to a specific out-of-state location or *587 source of origin, and the court found that such a connection had not been established for the remaining images. Under Schaefer, the court rejected as insufficient Agent Cecchini’s testimony that he had seen the images before on the Internet because that testimony did not link any particular image to a particular out-of-state location.
In denying in part Mr. Dayton’s Rule 29 motion, the district court declined to adopt Mr. Dayton’s reading of Schaefer. The court acknowledged that, under Mr. Dayton’s interpretation of Schaefer, he would have to be found not guilty of the charges against him because there was no proof that the images traveled in interstate or foreign commerce at the time that the defendant received them from LimeWire and because the distribution from Mr. Dayton to Agent Cecchini occurred wholly within Tulsa, Oklahoma. More specifically, the court refused to read Schaefer as “requiring] proof that the visual depiction possessed or distributed, moved directly to defendant’s computer from an out-of-state location, or moved to an out-of-state location directly from defendant’s computer.” Id. at 317. The district court believed that such a broad interpretation of Schaefer would prevent the federal government from prosecuting child pornography cases.
At the preliminary jury instruction conference, Mr. Dayton also objected to the proposed instruction on the definition of “distribute,” which would instruct the jury that a person distributes child pornography when he places it in a shared folder, thereby making it available to others to search out and download in a P2P network. The district court overruled his objection pursuant to United States v. Shaffer, 472 F.3d 1219, 1223-25 (10th Cir.2007).
At the close of the defendant’s case, Mr. Dayton renewed his Rule 29 motion. The district court again denied the motion as to those seven images. Those images were submitted to the jury for deliberation, and the jury convicted Mr. Dayton on both counts—possession and distribution—as to all seven images. Thereafter, the court denied Mr. Dayton’s motion to suppress, which the court previously had held in abeyance.
At Mr. Dayton’s sentencing hearing, the court found that Mr. Dayton had an “extraordinary physical impairment” under the U.S. Sentencing Guidelines Manual (“U.S.S.G.”) because he has severe Crohn’s disease.[3] The court found that home detention would not be appropriate after Mr. Dayton had been convicted. Recognizing that there was a mandatory statutory minimum of sixty months’ imprisonment, the court decided to grant a downward variance of ten levels, reducing the total offense level from thirty-six to twenty-six.[4] An offense level of twenty- *588 six, with a criminal history category of I, corresponded to an advisory Guidelines range of sixty-three to seventy-eight months’ imprisonment.[5] The district court noted that, in granting the downward variance, it had not only reviewed Mr. Dayton’s extensive medical records, but had considered the sentencing factors enumerated in 18 U.S.C. § 8553(a), including Mr. Dayton’s lack of any prior criminal history. The court sentenced Mr. Dayton to sixty-three months’ imprisonment, to be followed by ten years of supervised release. The court allowed Mr. Dayton to remain free on bond pending placement in an appropriate facility that could meet his medical needs. This appeal timely followed.
II. Discussion
On appeal, Mr. Dayton argues that the government offered insufficient evidence of an interstate nexus to support his convictions for possession and distribution of child pornography under 18 U.S.C. § 2252(a)(2) and (a)(4)(B). He contends that, under Schaefer, the government cannot satisfy the statutory interstate commerce requirement by demonstrating that copies of the images—viz., copies of the particular images that are the subject of the instant criminal charges—at some pri- or point in time had traveled in interstate commerce. Mr. Dayton also argues, in the alternative, that the district court improperly instructed the jury on the element of distribution. In his view, Shaffers holding that a person distributes child pornography by making it available to others on a P2P network is potentially irreconcilable with Schaefers admonition that more than the mere use of the Internet is required to prove an interstate nexus. He seeks “guidance and [a] ruling on what a proper instruction would be given the[se] holdings.” Aplt. Br. at 63.
The government responds that it proved that the videos, which Mr. Dayton indisputably distributed, had been transported in foreign or interstate commerce because
[a]n FBI agent identified the victim featured in one of the videos as “Vicky” from Richland, Washington, and testified that the video had been made in Washington. Another of the videos contained ample circumstantial evidence to allow a reasonable jury to conclude that it was produced in Southeast Asia, and thus to infer that it must have been transported in interstate commerce pri- or to its distribution by Dayton.
Aplee. Br. at 14.[6] As to the possession count, the government contends that proof that Mr. Dayton “possessed digital images *589 that originated in Paraguay was sufficient to establish that the images must have been transported in foreign commerce to be found in Oklahoma.” Id. at 13.[7]
The government maintains that SchaefePs focus on whether a “particular image” has traveled in interstate commerce is impractical in the digital age. It urges us to limit Schaefer to its facts and to “hold that proof that an image originated outside the state in which it was found is sufficient to establish that it was transported in interstate or foreign commerce.” Id. at 15 (emphasis added). More specifically, the government argues that “[t]his Court should hold that evidence establishing that an image traveled in interstate commerce at some point in time is sufficient to establish the jurisdictional element of § 2252.” Id. at 37 (emphasis added). In other words, the government contends that the jurisdictional inquiry should not be focused upon whether the particular images depicting child pornography—viz., the particular images obtained on digital files in connection with the investigation and criminally charged in this case—traveled interstate (i.e., crossed state lines), but instead on whether the originals of those images, or even any copies of them that depict the same child pornography, traveled interstate. As to Mr. Dayton’s argument regarding the jury instruction on distribution, the government maintains that the district court did not abuse its discretion in giving that instruction because Schaefer “addressed only the sufficiency of evidence to meet the interstate commerce element of the distribution statute, and did not affect the continuing validity of Shaffer’s definition of distribution.” Id. at 15.
A. Standard of Review
“Whether the government presented sufficient evidence to support a conviction is a legal question that we review de novo.” United States v. Hasan, 609 F.3d 1121, 1132-33 (10th Cir.2010) (quoting United States v. Parker, 551 F.3d 1167, 1172 (10th Cir.2008)) (internal quotation marks omitted); see also United States v. Cesareo-Ayala, 576 F.3d 1120, 1125-26 (10th Cir.2009) (reviewing de novo defendant’s challenge to denial of motion for acquittal on sufficiency-of-the-evidence grounds). Under the Due Process Clause, the evidence is sufficient to support a conviction if, “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing a sufficiency-of-the-evidence challenge, we “view the evidence in the light most favorable to the government in order to determine whether all of the evidence ... together -with the reasonable inferences to be drawn therefrom, convinces us that a rational factfinder could reasonably have found the appellant guilty of the crime charged beyond a reasonable doubt.” United States v. Burkley, 513 F.3d 1183, 1188 (10th Cir.2008) (alteration omitted) (quoting United States v. Chavez-Palacios, 30 F.3d 1290, 1293-94 (10th Cir.1994)) (internal quotation marks omitted).
B. Mr. Dayton’s Sufficiency-of-the-Evidence Challenge
We will begin with the issue that we find to be dispositive—whether there was in *590 sufficient evidence that the images Mr. Dayton distributed and possessed had traveled in interstate or foreign commerce. Because this issue dictates our resolution of this appeal, we need not address Mr. Dayton’s remaining claim.
Mr. Dayton was convicted of distributing and possessing child pornography in violation of 18 U.S.C. § 2252(a)(2) and (a)(4)(B). At the time of Mr. Dayton’s conviction, the statute (which has since been amended)[8] provided in relevant part that a person shall be guilty of distributing child pornography if he
knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—
(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(B) such visual depiction is of such conduct....
18 U.S.C. § 2252(a)(2) (2006) (amended 2008). It also provided in relevant part that a person is guilty of possessing child pornography if he
knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—
(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(ii) such visual depiction is of such conduct....
Id. § 2252(a)(4)(B) (2006) (amended 2008).
The distribution and possession sections contain coterminous jurisdictional requirements, namely, that the images “ha[ve] been mailed, or ha[ve] been shipped or transported in interstate or foreign commerce.” We must determine whether there was sufficient evidence to satisfy those jurisdictional requirements in this case.[9]
*591 In this endeavor, we are guided by two of our prior cases—United States v. Wilson and United States v. Schaefer.[10] *592 As we will explain, those cases instruct us to focus upon whether the particular images distributed or possessed by the defendant themselves moved in interstate commerce. Wilson involved a sufficiency-of-the-evidence challenge to a conviction under § 2252(a)(4)(B). 182 F.3d 737, 739-40 (10th Cir.1999). That case implicated the “materials” prong discussed above. See supra note 9. The Wilson court held that the evidence was insufficient to demonstrate the jurisdictional nexus for which Mr. Wilson had been indicted—that is, “that the visual depictions contained on the [computer] diskettes were produced using materials that traveled in interstate or foreign commerce.” Id. at 741 (footnote omitted). In reaching that conclusion, we rejected a law enforcement agent’s testimony “that some of the images at issue originated, from German magazines” as insufficient to satisfy the jurisdictional nexus requirement. Id. at 744 (emphasis added). We reasoned that the agent
offered no explanation, however, as to how those particular images found their way to the diskettes in defendant’s possession. Nor did the prosecution otherwise attempt to outline the possible methods by which defendant could have obtained the files through interstate commerce (e.g., obtaining copies of the German magazines and scanning the images into his computer; downloading copies of the images from an out-of-state computer via the Internet or a BBS, etc.).
Id. (emphasis added). The Wilson court offered the following example to illustrate its point:
Imagine a person possesses a magazine and makes a color photocopy (copy # 1) of one of the images contained therein. Further imagine such person uses copy # 1 to make a second color photocopy (copy # 2). Although the magazine would be a “material” used to produce copy # 1, it would not be a “material” used to produce copy #2. Thus, the fact that some of the images possessed by defendant originated at some point in German magazines does not demonstrate, without more, that the German magazines were actually “materials” used to produce the images possessed by defendant.
Id. at 744 n. 5 (emphasis added). Wilson clearly rejected the idea that testimony regarding the foreign (or out-of-state) origins of the original image was sufficient to establish the jurisdictional nexus as to the particular copy of that image that was the subject of the prosecution.
In Schaefer, we applied Wilson to facts like those present here. In that case, Mr. Schaefer brought a suffieiency-of-the-evidence challenge to his convictions for receiving child pornography and possessing child pornography. 501 F.3d at 1198. There, we held that the jurisdictional nexus requires movement across state lines and that it is not enough to assume that an Internet connection necessarily establishes *593 interstate travel. Id. at 1200-01.[11] We reasoned that, although “in many, if not most, situations the use of the Internet will involve the movement of communications or materials between states[,] ... this fact does not suspend the need for evidence of this interstate movement.” Id. at 1201. We held that “[a]fter establishing a computer or Internet connection as the method of transport, the government must still prove that the Internet transmission also moved the images across state lines.” Id. (emphasis added). Schaefer followed Wilson’s holding that the government must demonstrate interstate travel for the particular images at issue in the criminal prosecution.[12] We stated that
even if we assume arguendo that the images appearing in the foreign-language movie clips and the image of the young girl originated outside of the State of Kansas (like the images from the German magazine in Wilson), the government offered no proof that the particular images on the CDs in question moved across state lines. In particular, the government offered no proof that Mr. Schaefer accessed the images through an interstate Internet connection and either downloaded them directly to the CDs or downloaded them to his computer and later transferred them to the CDs.
Id. at 1206; see also id. at 1206 n. 11 (“Indeed, the government offered no solid proof linking Mr. Schaefer’s use of the Internet—whether involving an interstate connection or not—to the pornographic images on the CDs. For example, the government made no effort to show that the specific images stored on Mr. Schaefer’s computer also appeared on the CDs.” (emphasis added)). This hypothetical in Schaefer rejects the notion, advocated by the government in this case, that the foreign or out-of-state origin of an image is sufficient to demonstrate an interstate nexus.[13]
*594 It is patent that our reasoning based upon Wilson was an essential foundation of our jurisdictional holding in Schaefer; consequently, it is binding upon us here. See Bates v. Dep’t of Com of Kan., 81 F.3d 1008, 1011 (10th Cir.1996) (“[A] panel of this Court is bound by a holding of a prior panel of this Court but is not bound by a prior panel’s dicta.”); see also Michael Abramowicz & Maxwell Stearns, Defining Dicta, 57 Stan. L.Rev. 953, 1065 (2005) (“A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta.” (emphasis added)).
Therefore, under Wilson and Schaefer we must determine whether there was sufficient evidence to establish that the particular images stored on Mr. Dayton’s hard drives and CDs and accessed by Agent Cecchini through LimeWire themselves traveled across state lines. We do not look to previous copies of those images or even the originals of those images, but rather focus our jurisdictional inquiry only on the particular images distributed and possessed by Mr. Dayton.[14]
*595 The government urges us not to follow Schaefer. It argues that a subsequent panel of this court limited Schaefer to its facts. See United States v. Vigil, 523 F.3d 1258, 1266 (10th Cir.2008). We are not persuaded by the government’s argument. In Vigil, a panel concluded with respect to a prosecution under the Hobbs Act, 18 U.S.C. § 1951(a), that “[a] rational jury could certainly conclude that Mr. Vigil’s acts either actually or potentially affected interstate commerce.” Id. at 1267. In reaching that conclusion, the Vigil court rejected the defendant’s reliance on Schaefer, finding that “Schaefer is distinguishable.” Id. at 1266. The Vigil court distinguished Schaefer first by saying, “the court concluded in Schaefer that Congress did not intend to exercise its full Commerce Clause power in enforcing the child pornography statute.” Id. In contrast, the Vigil court reasoned that the Hobbs Act did involve Congress’s full exercise of Commerce Clause power, saying that “[t]he words of the Hobbs Act suggest that Congress intends to use all of its authority under the [CJommerce [Cjlause.” Id.
The Vigil court next compared and contrasted the absence of any evidence regarding interstate commerce in Schaefer with the sufficient evidence of interstate commerce before it. Id. The court explained that the government’s only evidence in Schaefer regarding the jurisdictional nexus was that the defendant in that case used the Internet, which did not automatically mean that there was a movement across state lines. Id. Based on that limited quantum of proof, the Vigil court stated that “Schaefer is limited to its facts—the government’s say so was not enough to prove that the Internet operates in interstate commerce, no matter how obvious.” Id. (citing Schaefer, 501 F.3d at 1207-08 (Tymkovich, J., concurring)). In contrast, the government in Vigil had presented evidence that the defendant’s actions had “either actually or potentially affected interstate commerce.” Id. at 1267.
Viewed in the context of its analysis, we do not read Vigil’s description of Schaefer as being “limited to its facts” as enervating in any material way the precedential force of Schaefer’s child pornography, jurisdictional holding. To some extent, all judicial decisions are limited to their facts. See Robinson v. Diamond Hous. Corp., 463 F.2d 853, 862 (D.C.Cir.1972) (“Every case is ‘limited to its facts,’ if by that phrase one means that the court based its judgment on the facts presented to it. But most cases are also decided with reference to some more general normative principle which extends beyond the specific circumstances of the case before the court. Indeed, it is the existence of such broader norms which distinguishes a decision which is principled and rational from one which is ad hoc and arbitrary.”).
As a function of common-law decision-making, all cases must be viewed as products of their factual context; it is from that context that decisions derive precedential force. See Allegheny Gen. Hosp. v. NLRB, 608 F.2d 965, 969-70 (3d Cir.1979) (“The essence of the common law doctrine of precedent or [sjtare decisis is that the rule of the case creates a binding legal precept.... A judicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hier *596 archy.”), abrogated on other grounds by St. Margaret Mem’l Hosp. v. NLRB, 991 F.2d 1146 (3d Cir.1993); see also Jeff Todd, Undead Precedent: The Curse of a Holding “Limited To Its Facts ”, 40 Tex. Tech L.Rev. 67, 75 (2007) (“To some extent, the process of applying prior cases to current litigation already involves limiting the precedential case to its facts. The holding of a particular case may control the result in future cases, but only those in which the facts are similar to the precedent case in all relevant respects.” (footnote omitted) (internal quotation marks omitted)); Abramowicz & Maxwell, supra, at 1065 (noting that a “holding consists of,” inter alia, “those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, [and] (2) are based upon the facts of the case .... ” (emphasis added)).
This is particularly true in the federal system because federal courts are constitutionally forbidden from issuing advisory opinions and are restricted to adjudicating concrete cases or controversies. U.S. Const, art. III, § 2, cl. 1; see United Pub. Workers of Am. (C.I.O.) v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (“As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.”).
The phrase “limited to its facts” has often been used imprecisely, and courts have not reached a uniform view as to its meaning. See Todd, supra, at 68 (“Numerous appellate courts, both federal and state, have limited—or ‘restricted’ or ‘confined’—a holding to its facts, and many more rely upon cases with such holdings. Although thousands of decisions have been limited in this manner, the meaning of this curse remains cloaked in shadow and mist. The courts declare this limitation but do not describe precisely what it means.” (emphasis added) (footnotes omitted)).[15] We *597 heretofore have not clarified what we meant in Vigil when we referred to Schaefer as being “limited to its facts.” As an initial matter, it goes without saying that the Vigil court was not empowered to overrule—even tacitly or indirectly—our holding in Schaefer. See, e.g., Thompson v. Weyerhaeuser Co., 582 F.3d 1125, 1130 (10th Cir.2009) (“Absent an intervening Supreme Court or en banc decision justifying such action, we lack the power to overrule our own precedent.”). Furthermore, the context in which the “limited to its facts” statement was made clearly reveals that the Vigil court was merely comparing the absolute lack of evidence in Schaefer of an interstate nexus—where the only evidence of such a nexus was “the government’s say so,” Vigil, 523 F.3d at 1266—and the more substantial (and ultimately sufficient) evidence of that nexus in Vigil, see id. at 1266-67. Vigil’s use of Schaefer as an “analogfy],” id. at 1266, surely cannot mean that we must await the unlikely occurrence of a factually identical case before we can apply Schaefer’s jurisdictional holding and reasoning. See Comment, Bush v. Gore and the Uses of “Limiting”, 116 Yale L.J. 1159, 1162 (2007) (“The use of ‘limited by’ serves as a caveat and not as an absolute bar to future application of the case. That a case is ‘limited by its facts’ does not mean that its application is limited only to those facts.” (footnote omitted)); cf. also Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (“While Parratt [v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981),] is necessarily limited by its facts to negligent deprivations of property, it is evident ... that its reasoning applies as well to intentional deprivations of property.”).
In any event, the facts to which Vigil purportedly limited Schaefer formed the bedrock for a legal holding regarding the jurisdictional scope of precisely the same child pornography provisions that are at issue here. Nothing in Vigil reasonably could be read to cast doubt on the merits of this jurisdictional holding or Schaefer’s interpretation of Wilson’s focus on the particular images at issue in a criminal prosecution. We underscore that Vigil involved a jurisdictional challenge under the Hobbs Act and not the child pornography statute at issue here. 523 F.3d at 1266. It only commented on Schaefer in deflecting the defendant’s argument by “analogfy]” that “his actions did not affect interstate commerce.” Id. Because our court in Vigil was not construing the language of the child pornography statutes, and, more specifically, not attempting to discern the scope of their jurisdictional provisions, we cannot conclude that Vigil calls into question the soundness of our *598 jurisdictional holding in Schaefer and its underlying rationale.[16]
Accordingly, we review the evidence of the jurisdictional nexus adduced at Mr. Dayton’s trial as that evidence relates to the particular images distributed and possessed by Mr. Dayton. First, as to the distribution charge, the government clearly did not prove travel in interstate or foreign commerce in showing that Agent Cecchini (in Tulsa) accessed those images from Mr. Dayton (also in Tulsa) through LimeWire. Although the government knew that Mr. Dayton’s ISP was Cox Communications, no evidence was introduced regarding the location of Cox’s servers. Cf United States v. Sturm, 560 F.Supp.2d 1029, 1082-83 (D.Colo.2008) (denying a motion to dismiss for lack of a jurisdictional nexus because there was evidence that the Colorado-based defendant used AOL to obtain child pornography, that AOL’s computer servers were located in Virginia, and any images on the defendant’s hard drive must have been routed through AOL’s servers in Virginia). On appeal, the government contends that testimony regarding the origins of the original video images is sufficient to establish the interstate nexus. We disagree. It is not enough to say that the (regrettably) well-known victim in the “Vicky” series was from Washington State and that Agent Cecchini had not only seen that video image before in other investigations, but that he had received it from other countries. No evidence was introduced concerning whether the particular video image of “Vicky” distributed by Mr. Dayton had traveled in interstate or foreign commerce. Furthermore, we also find insufficient the evidence that one video image may have been originally filmed in Southeast Asia[17] and that Agent Cecchini testified he had seen all of these video images during prior investigations. As in Schaefer, “the government offered no proof that the particular [video images] in question moved across state lines.” 501 F.3d at 1206. Similarly, the evidence proffered as to the possession charge related only to the origins of the original pictures—viz., Agent Trifiletti’s testimony that the victims depicted in those pictures lived in Paraguay and had never left that country. There was no evidence as to how Mr. Dayton obtained the particular pictures he possessed.
Consequently, we must conclude that the government’s jurisdictional proof regarding both the distribution and possession counts was insufficient to support Mr. Dayton’s convictions under 18 U.S.C. § 2252(a)(2) and (a)(4)(B).[18]
*599 III. Conclusion
For the reasons discussed above, we conclude that the government presented insufficient proof to establish the requisite jurisdictional nexus under 18 U.S.C. § 2252(a)(2) and (a)(4)(B). Accordingly, we REVERSE Mr. Dayton’s convictions and REMAND the case to the district court with instructions to VACATE its judgment and enter a judgment of acquittal.

 This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

. Other LimeWire users may not add to another user’s shared folder; they may only access that folder for downloads. This means that if a file is in a LimeWire user’s shared folder, then that user put it there.

. Agent Cecchini testified that an IP address is assigned by an Internet service provider and is unique to a computer such that no two computers share the same IP address.

. Section 5H1.4 provides in relevant part that:
[plhysical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.
U.S.S.G. § 5H1.4 (2009) (amended 2010).

. Although § 5H1.4 speaks in terms of a downward departure, the defendant filed a motion for a downward variance, so the district court chose to vary downward rather than depart downward. The court noted the inconsistency of that action with § 5H1.4's reference to a departure, but stated that "whether it's deemed a variance or a departure, it's appropriate.” R., Vol. III, at 123 (Sentencing Hr'g, dated Jan. 12, 2009). See generally United States v. Atencio, 476 F.3d 1099, 1101 n. 1 (10th Cir.2007) ("We now clarify that when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines, the re *588 sulting increase or decrease is referred to as a 'departure.' When a court enhances or detracts from the recommended range through application of [18 U.S.C.] § 3553(a) factors, however, the increase or decrease is called a ‘variance.’ ”), overruled in part on other grounds by Irizarry v. United States, 553 U.S. 708, 713 n. 1, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008).

. This was a significant reduction in the applicable advisory Guidelines range for Mr. Dayton. Without that downward variance, the advisory Guidelines range for an offense level of thirty-six, and a criminal history category of I, was 188 to 235 months’ imprisonment.

. The government limits its argument before us concerning the distribution count: it only seeks to establish that the videos concerning "Vicky” and the purported Southeast Asian minor satisfy the statute's jurisdictional nexus. The government emphasizes that it "presented evidence that would have allowed a reasonable jury ... to conclude that two of the videos Dayton distributed were created outside Oklahoma.” Aplee. Br. at 26 (emphasis added); see id. at 23 ("[T]he government presented sufficient evidence to allow a reasonable jury to find that at least two of the videos were produced outside of the state of Oklahoma.” (emphasis added)). Notably, although the government mentions the district court’s consideration of the video of a minor *589 who allegedly was speaking a foreign language that sounded like German or Russian (i.e., the video described as the "baby-sitter abuse tape”), it does not attempt to defend the district court's decision to send that video to the jury. See id. at 23 n. 2.

. In its jurisdictional argument concerning the possession count, the government exclusively focuses on the three images that allegedly originated in Paraguay.

. The amendment has the effect—as apparently intended by Congress—of broadening the jurisdictional scope of the child pornography statute. See United States v. Lewis, 554 F.3d 208, 216 (1st Cir.) ("[W]e should note that Congress recently amended the child pornography statutes, including the one before us, to expand the jurisdictional coverage. It did so by replacing all instances of 'in interstate' with 'in or affecting interstate' commerce. The legislative history indicates that Congress was unhappy with circuit court decisions narrowly construing the prior statute ....” (citation omitted) (quoting Effective Child Pornography Prosecution Act of 2007, Pub.L. No. 110-358, § 103)), cert. denied,-U.S.-, 129 S.Ct. 2753, 174 L.Ed.2d 261 (2009); see also United States v. Wright, 625 F.3d 583, 599 (9th Cir.2010) ("In 2008, Congress passed the 2007 Act,” which was "[bjased in part on a finding in the 2007 Act that '[t]he transmission of child pornography using the Internet constitutes transportation in interstate commerce' (alteration in original) (emphasis added) (quoting Pub.L. No. 110-358, § 102(7))).

. As is evident from the plain language of the statute, there is another way to satisfy the requisite jurisdictional nexus of § 2252(a)(4)(B)—that is, by proving that the images were "produced using materials which have been mailed or so shipped or transported [in interstate or foreign commerce], by any means including by computer.” On appeal, the government argues that *591 it also satisfied the jurisdictional requirement for Mr. Dayton's possession charge through testimony at trial that the computer hard drives upon which the images were discovered were manufactured in Thailand. Specifically, Agent Cecchini testified that the two hard drives used by Mr. Dayton were labeled with the phrase "Product of Thailand” or "Made in Thailand.” R., Vol. II, Pt. 1, Tr. at 167-68. Thus, the government argues that "because the images were found on a hard drive that was manufactured in Thailand, they were produced using materials that were shipped or transported in foreign commerce.” Aplee. Br. at 13-14 (internal quotation marks omitted). See generally United States v. Schene, 543 F.3d 627, 639 (10th Cir.2008) (holding, under plain-error review, where the hard drive was manufactured in Singapore that "[i]t is obvious that the government’s evidence was sufficient ... to show that each 'image of child pornography’ had been copied or downloaded to [the defendant’s] hard drive in one capacity or another, and was therefore 'produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce.’” (quoting 18 U.S.C. § 2252A(a)(5)(B))).
However, this argument is wholly without merit and may be disposed of in short order. The government failed to charge the materials prong of the statute in the Indictment and, therefore, the jury’s verdict could not properly rest on this basis. See United States v. Rahseparian, 231 F.3d 1257, 1264-66 (10th Cir.2000) (explaining that the indictment clearly did not charge the defendant with a particular part of the statute and stating that "it is a fundamental precept of federal constitutional law that a court cannot permit a defendant to be tried on charges that are not made in the indictment” (alteration omitted) (quoting Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir.1990) (per curiam)) (internal quotation marks omitted)); cf. United States v. Bishop, 469 F.3d 896, 902 (10th Cir.2006) ("If an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars.”), abrogated in part on other grounds by Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); United States v. Gonzalez Edeza, 359 F.3d 1246, 1250 n. 1 (10th Cir.2004) (explaining that the rule against constructive amendment of the indictment “protects both a defendant’s right to be subjected only to charges set by a grand jury and his interests in having sufficient notice”); United States v. Hien Van Tieu, 279 F.3d 917, 921 (10th Cir.2002) (same).
The Indictment charged only that Mr. Dayton had possessed images that themselves had been transported in interstate or foreign commerce and contained no reference to the materials prong of § 2252(a)(4)(B). Count Two of the Indictment charged that Mr. Dayton
knowingly possessed and attempted to possess visual depictions of minors engaging in sexually explicit conduct, as that term is defined in Title 18, United States Code, Section 2256(2)(A)(i-v), to-wit: video files and graphic image files ..., each of which files had been transported in interstate or foreign commerce by computer, the producing of each of which files involved the use of minors engaging in sexually explicit conduct, and each of which files were of such sexually explicit conduct, in violation of Title 18, United States Code, Section 2252(a)(4)(B).
R., Vol. I, Pt. 1, at 24 (Indictment, filed May 9, 2007). Because Mr. Dayton was not charged with the possession of images that had been “produced using materials which have been mailed or so shipped or transported, by any means including by computer,” that conduct simply could not have properly formed the basis for his conviction. Therefore, the government’s reliance on that method of proving the requisite jurisdictional nexus must fail.
Moreover, although the government preserved this argument before the district court by objecting to the court's decision not to instruct the jury on the hard drives’ Thai origins, we note that the government preserved that objection only when urged to do so by the district court, which was seeking guidance in interpreting Tenth Circuit precedent on this issue. The government admitted that its case really turned on whether the images traveled at some point in interstate or foreign commerce and not on the alleged foreign origin of the hard drives.

. In an attempt to resolve the question that Mr. Dayton presents in this appeal, the Dissent ventures into the realm of statutory analysis and explores legislative and congressional *592 findings. This endeavor, however, is misguided. The Dissent contends that "the critical task in resolving Dayton’s jurisdictional challenge is determining precisely what was intended by the statutory phrase 'visual depiction.’ ” Dissent at 3. The Dissent then seeks to accomplish this task by, first, looking to the plain language of the statute’s definition of "visual depiction” and, then, to the legislative history and congressional findings purportedly relevant to the meaning of this term. As the Dissent sees it, this inquiry is analytically necessary. Under the circumstances surrounding this case, we disagree. Whether the Dissent is willing to accept it or not, we do not write on a blank slate in addressing the jurisdictional issue that Mr. Dayton raises in this appeal. As we note in text, our analysis is guided by our prior decisions in Wilson and Schaefer.

. The Ninth Circuit recently interpreted essentially identical language in a pre-2008amendment child pornography statute in the same way. See Wright, 625 F.3d at 594 ("[Sjection 2252A(a)(l)'s jurisdictional element is focused not on the means the defendant uses to mail, transport, or ship child pornography, and its connection to interstate commerce. Rather, it requires that the defendant mail, transport, or ship child pornography interstate."); see also id. at 597-98 ("Whether the defendant transported child pornography by mail, by sea, or by computer, the government must still prove it crossed state lines.”).

. The Dissent’s contention that Schaefer's panel "simply assumed, without directly deciding, that the phrase [‘visual image’] referred to specific images possessed by defendant,” Dissent at 14, is fatuous at best. As our analysis makes patent, Schaefer squarely held (relying upon Wilson) that the focus of the jurisdictional inquiry is on the particular image of child pornography possessed or received by the defendant.

.The Dissent notes that the government's understanding of the statute’s jurisdictional requirement—which the Dissent embraces—is "analogous to the manner in which we interpret federal firearms offenses.” Dissent at 8 n. 5. True enough. But the jurisdictional principles governing firearms statutes do not indicate that we should adopt a different approach here. Indeed, those principles establish the same analytic baseline—viz., whether there is sufficient proof that the particular item at issue has crossed state lines. In the case of a firearm, if the government establishes that the particular firearm has crossed state lines at some point prior to the prosecution, it has carried its jurisdictional burden. That fact frequently can be established by mere visual inspection of the firearm itself— with the operative inquiry in that instance being whether this kind of firearm is made in the state where it is found; if not, a rational jury could find that it crossed state lines to reach that state. See, e.g., United States v. Snow, 82 F.3d 935, 941 (10th Cir.1996) (noting that the “unrefuted and unchallenged evidence” by a law enforcement agent on direct examination "established there are only two *594 gun manufacturers in Wyoming, neither of which manufacture the type of weapon [the defendant] was charged with stealing and possessing[,]" and that this evidence along with other evidence related to the origin the type of gun was sufficient proof “to establish that at some point the gun had to have crossed state or national lines in order to have been available for sale in Wyoming”); cf. United. States v. Overstreet, 40 F.3d 1090, 1095 (10th Cir.1994) (holding that the district court did not abuse its discretion in admitting testimony of a law enforcement agent who "had no knowledge or opinion about the firearm identified in the indictment” but stated that "there are not, and have never been, any manufacturers of revolvers in Oklahoma ... [and] any revolver used during a carjacking in Oklahoma necessarily travelled in interstate commerce”). Alas, in the digital context, things are not that simple. By merely examining an image of child pornography, we cannot establish whether that particular image, as opposed to a prior iteration of that image, has crossed state lines. More is needed. Therefore, our interpretation of the jurisdictional requirement in the firearms context does not detract from the conclusion that we reach here. In both contexts, the objective of the jurisdictional inquiiy is to determine whether the particular item at issue has crossed state lines; the evidentiary burden to establish that fact is simply lighter in most instances in the firearms context.

. The Dissent contends that our reading of Wilson and Schaefer results in the absurd situation wherein successful child pornography prosecutions are only possible where the defendant "physically transports] the hard drive or CDs containing [the illicit images] across state lines.” Dissent at 10. This argument is specious at best, and is belied by our own case law. For instance, we recently acknowledged, in United States v. Dobbs, the possibility that a computer user who knowingly accesses images of child pornography online may be found guilty of receipt under 18 U.S.C. § 2252(a)(2), so long as in doing so he had "the ability to exercise control over them by, for example, clicking on or enlarging them.” 629 F.3d 1199, 1204 (10th Cir. 2011). In such instances, as the Dissent there recognized, the files created as a result of the defendant’s online activity (i.e., the files in the computer’s cache) are not the basis for conviction, per se; rather, they are only circumstantial "proof” of the crime. Id. at 1213 (Briscoe, C.J., dissenting) (”[T]he existence of copies of the images in the cache of his computer was, like fingerprints left at the scene of the crime, merely evidence of his actual criminal activity.”). Had it been shown in Dobbs that the defendant knowingly viewed these images when on his screen and had the ability to manipulate them, our decision would have turned on whether the government also could show that those images arrived on his screen by virtue of an "Internet transmission [that] moved the images across state lines,” Schaefer, 501 F.3d at 1201, regardless of whether a distinct file was created on the defendant’s computer. Recognizing this, we believe that nothing in our precedent, or our decision here today, compels—or, for that matter, supports—the Dissent's peculiar conclusion that, going forward, only the transportation of *595 physical media containing digital images across state lines will allow for a successful child pornography prosecution.

. Many courts have recognized the continued vitality of cases long-since "limited to [their] facts.” See, e.g., Holmes v. United States, 876 F.2d 1545, 1548 (11th Cir.1989) (noting that, while the earlier case of Trujillo v. United States, 377 F.2d 266 (5th Cir.1967), had been "limited to its facts,” "[n]either the former Fifth Circuit nor the Eleventh Circuit has reversed the holding in Trujillo [and][t]hus, the ruling remains binding precedent on this court”); Davis v. Page, 618 F.2d 374, 383 n. 9 (5th Cir.1980) (supporting its decision regarding the rights of indigent parents to counsel in Florida child dependency proceedings by reference to the Supreme Court’s holding in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), which the court recognized ”ha[d] been strictly limited to its facts”); Bacon v. Hennepin Cnty. Med. Ctr., No. 06-CV-2359, 2007 WL 4373104, at *9 (D.Minn. Dec. 11, 2007) (noting that there was nothing inherently "unique” about the facts of a decision that had been "limited to its facts,” and then applying that decision over a more recent, conflicting appellate ruling based on the principle that the earliest opinion—absent a subsequent en banc or Supreme Court ruling—is binding in the case of an intra-circuit split); see also Stewart v. Blackwell, 444 F.3d 843, 859-60, 868 (6th Cir.2006) (relying extensively on Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), in determining that Ohio had violated the Equal Protection Clause by failing to utilize uniform voting technologies across the state, despite the Supreme Court stating that its holding in Bush was "limited to the present circumstances”), superseded by 473 F.3d 692 (6th Cir.2007), vacating as moot 356 F.Supp.2d 791 (N.D.Ohio 2004); Focus Inv. Assocs., Inc. v. Am. Title Ins. Co., 992 F.2d 1231, 1242-43 (1st Cir.1993) (relying in large part on the logic of Phalen Park State Bank v. Reeves, 312 Minn. 194, 251 N.W.2d 135, 141 (1977), a decision which the authoring court had itself "limited to the unique facts and circumstances presented in this case,” en route to finding that the appellant had standing to raise a usury defense).
To be sure, other courts have a different view. For example, some courts have treated the decision to limit a case to its facts as akin to an implicit overruling. See, e.g., Schu *597 macher v. United States, 931 F.2d 650, 654 (10th Cir. 1991) (dismissing the persuasive value of the logic of McNamara v. Comrn'r of Internal Revenue, 827 F.2d 168 (7th Cir. 1987), a case that had subsequently been "limited to its facts”); Ingalls Shipbuilding Div., Litton Sys., Inc. v. White, 681 F.2d 275, 288 n. 13 (5th Cir. 1982) ("[S]ince the disposition of [In-galls Shipbuilding Corp. v.] Joyner [587 F.2d 649 (5th Cir. 1978)] is expressly limited to its facts, we do not regard th[is] circumscribed decision[ ] as creating a precedential rule that controls our conclusion in this case.” (internal citation omitted)), ovemiled on other grounds by Newpark Shipbuilding & Repair, Inc. v. Roundtree, 723 F.2d 399 (5th Cir.1984); Bacon, 2007 WL 4373104, at *9 ("To assert that an opinion of an appellate court has been ‘limited to its facts’ is usually a polite way of saying 'implicitly overruled.’ ”).
This lack of uniformity in how courts have interpreted the phrase "limited to its facts” counsels that it is wise to focus on the specific context in which the language is used. As noted infra, based upon a careful examination of the Vigil case—the context at issue here—it is apparent that this phrase, as applied to Schaefer, does not weaken in any material way the precedential force of Schaefer's jurisdictional holding and its supporting rationale.

.We are likewise not given pause by our unpublished—and therefore nonprecedential—decision in United States v. Swenson, which held that there was no plain error in the defendant’s conviction for images produced in South America because "[a] reasonable jury could (even if it need not) conclude from this evidence that, for the image to wend its way from South America to Wyoming, it had traveled in interstate or foreign commerce.” 335 Fed.Appx. 751, 753 (10th Cir. 2009). Swenson ignored Wilson and Schaefer's distinction between an original and a copy and the resultant possibility that a defendant could have obtained the particular images from within the state’s borders as contemplated by Wilson. Nor are we swayed by the more recent unpublished decision in United States v. Espinoza, which relied on Swenson in what the court deemed a "factually similar case.” 403 Fed.Appx. 315, 318 (10th Cir.2010). Espinoza adopted Swenson's reasoning whole cloth, and in doing so replicated its error.

. The district court’s conclusion as to the Southeast Asian origination of the video was based only on the perceived race of the people depicted in the video and the video’s titular reference to "cambodian” and "sex tourist.”

. The Dissent sounds an alarmist call for an en banc proceeding, suggesting that Schaefer's jurisdictional holding is “improperly *599 hampering the prosecution of child pornography cases in this circuit.” Dissent at 15 n. 9. Putting aside the fact that our task as judges is not to interpret statutes in a manner that best facilitates government prosecutions, but rather in a manner that effectuates Congress's will, we underscore that the impact of Schaefer's holding is necessarily very limited. Congress amended the statute in 2008, effectively broadening the jurisdictional language that was at issue in Schaefer. See supra note 8.
Therefore, Schaefer only affects the presumably small number of pending cases that were prosecuted under the pre-amendment statute, and insofar as Schaefer's holding could be viewed as having legally improper effects—a perspective that we reject—those effects will be short-lived. It ineluctably follows that expending the tremendous judicial resources associated with an en banc proceeding with the aim of correcting those short-lived effects would be a dubious undertaking indeed.